IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>JAMES FIDEL SOTOLONGO and<br>STEPHANIE MUSSELWHITE,<br><br>  Defendants. | No.  6:13cr00099-JAJ-KRS<br><br><br>**ORDER** |

    This matter comes before the court pursuant to defendants James Sotolongo and Stephanie Musselwhite's May 30, 2014 Motion for a New Trial. [Dkt. No. 245] The court held a hearing on this motion on August 13, 2014 at which defendant Sotolongo was present and represented by John Bergendahl.  Defendant Musselwhite was present and represented by Richard Klugh.  The motion for a new trial is denied.

    On April 24, 2013, the grand jury for the Middle District of Florida returned a fourteen count indictment charging defendants Sotolongo, Musselwhite, Christopher Mencis and Ramara Garrett with a conspiracy to make false statements to financial institutions and to devise a scheme and artifice to defraud federally insured financial institutions by engaging in mortgage fraud.  Defendant Christopher Mencis pleaded guilty prior to trial and testified in the government's case in chief.  Ultimately, defendant Sotolongo was found guilty of Counts 1 through 12 and was acquitted on Count 14.  Defendant Musselwhite was found guilty on Counts 1, 4-12 and 14.  She was acquitted on Counts 2 and 3.  Ramara Garrett was acquitted on Counts 1 and 14, the only counts alleged against her.

## I. New Trial - Standard

Pursuant to Federal Rule of Criminal Procedure 33(a),

> Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.

The interest of justice standard is broad and is not limited to cases where the district court concludes that its prior rulings were legally erroneous. United States v. Hatcher, 2011 WL 4425314 (11th Cir. 2011). A new trial can be granted whenever something about the former trial rendered it "fundamentally unfair". Id.

## II. Motion for New Trial

In their joint motion for a new trial, the defendants make eight claims. First, they contend that their Sixth Amendment right to an impartial jury was violated due to an under-representation of African American jurors. Second, they contend that court security officers turned away prospective jurors at the front door who they found to be in violation of the Orlando Division juror dress code. Third, they contend that an instruction on the good faith defense was unjustifiably omitted from the court's preliminary instructions to the jury. Fourth, they contend that the court erroneously permitted the jurors to keep a copy of the preliminary instructions during the trial and deliberations. Fifth, the defendants contend that financial institution records custodians were improperly permitted to give expert opinions at trial. Sixth, defendant Musselwhite contends that the court erroneously denied her theory of the defense instruction. Seventh, defendant Sotolongo contends that he was denied due process of law when his pretrial plea agreement was rejected by a district judge who later recused himself from the case. Finally, the defendants contend that the government improperly moved to transfer this case from the original judge assigned to it. The court addresses each of these contentions in turn.

### A. Under Representation of African Americans on the Jury Panel

The court summoned fifty jurors for this case. Of those fifty, one (2%) was of African American ancestry. The defendants contended at the conclusion of the jury selection process that because census data shows a significantly higher percentage of African Americans residing in the counties from which this jury pool was drawn, their right to an impartial jury was violated. The court rejected the argument because the defendants made no allegation at that time concerning a systematic exclusion of African Americans from the jury pool.

In the motion for new trial, defendants Sotolongo and Musselwhite now make their systematic exclusion argument.

> Absent a flaw in the process utilized in drawing the venire that resulted in the systematic exclusion of African Americans, there is no explanation for such an overwhelming representation.

Dkt. No. 245, p. 3. The argument assumes that there was a systematic exclusion of African Americans because the defendants cannot otherwise explain why only one African American juror was summoned. However, their burden is greater than this.

In order to make a prima facie showing of a Sixth Amendment fair cross section violation, the defendant has the burden to show three things. First, that the group alleged to be excluded is a "distinctive" group in the community. Second, that the representation of the group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community. Third, that the under-representation is due to systematic exclusion of the group in the jury selection process. Berghuis v. Smith, 559 U.S. 314, 319 (2010) quoting Duren v. Missouri, 439 U.S. 357 (1979). In this case, the defendants do not challenge the court's jury selection plan[1] or identify any process that results in the systematic exclusion of African-Americans other than the dress code issue

---

[1] That plan was approved in United States v. Pritt, 458 Fed. Appx. 795 (11th Cir. 2012).

addressed below. They have simply failed to make a prima facie showing of a Sixth Amendment violation.

### B.  Orlando Division Juror Dress Code

The Orlando Division has a dress code for jurors. Jurors who are unable to comply with the dress code are given appropriate attire. Ultimately, the trial judge makes the determination as to whether and how to enforce the dress code.[2]

The defendants contend that the court security officers enforced the dress code at the front door and that a number of prospective jurors were denied entry to the courthouse for lack of compliance with the dress code. The defendants state:

> These prospective jurors were simply sent away. They were never allowed entry to the courthouse and were thus excluded from the venire from which the jury in this case was eventually selected.

Dkt. No. 245, p. 4. The allegations are supported by an affidavit in which a private investigator claims to have seen two individuals leave the courthouse that morning before entering. Dkt. No. 261.

The clerk of court maintains records concerning the summoning of jurors. On the morning of trial in this case, ninety-eight jurors were summoned to the courthouse. Five jurors were excused during the jury's orientation.[3] Three jurors were tardy. Only two failed to appear. The two jurors who failed to appear are Caucasians. The remaining

---

[2] This court has never seen a juror dress code before this case. This court's reaction is that the dress code adds a positive sense of decorum to the courtroom. It promotes respect for the decision makers and gives the appearance that the jurors treat the matter with great respect. The practice is well worth preserving.

[3] One was excused because he was over seventy years old. Another was excused because his mother-in-law passed away the day before. Another was excused because his vehicle broke down. Another was excused because he had paid to attend a course scheduled for April 16-17, 2014. Finally, a juror was excused because he did not speak or understand the English language. Four of the five were Caucasian jurors. The man who spoke no English is Hispanic.

eighty-eight jurors were sent to two courtrooms. Fifty jurors came for this trial. Thirty-eight jurors were summoned for another trial. The fact is that ninety-six out of the ninety-eight jurors who were summoned appeared. The two who failed to appear identified themselves as Caucasians.[4] Obviously, the clerk could not have checked in these jurors if they had been sent home by court security officers at the front door. It did not happen.

### C. Preliminary Instructions

It is the practice of this and every other district judge I know to give preliminary instructions to the jury. A proposed set of preliminary instructions was sent out well in advance of trial. A reasonable deadline was created for the parties to respond to the proposed set. The parties made objections and suggestions. Dkt. No. 243. Many of those objections and suggestions were immediately incorporated into the preliminary jury instructions. The instructions described the role of the jury, what is and is not evidence, and gives suggestions for how to view the credibility of witnesses. The burden of proof is explained to the jury. The instructions contain an elaborate recitation of how to be a good juror by not soliciting or receiving extrinsic evidence about the case. Dkt. No. 207. The instructions caution the jurors to give separate attention to each count and each defendant. On the morning of trial, a good faith defense instruction was tendered and rejected as untimely. It was later accepted and used in the final instructions. Dkt. No. 228.

This was unquestionably a complex case. Counts 2 through 12 allege a scheme and artifice to defraud and to obtain money and property from FDIC-insured banks and mortgage lenders over an approximately nine month period of time. Count 14 charged false representations in connection with a large loan. Count 1 charged the overarching conspiracy. To aid the comprehension of these matters, the court set forth the allegations

---

[4] The court takes judicial notice of its records. If a defendant disputes the existence of these records, he or she can request a hearing on the matter at which the government can present evidence of these records.

5

in the indictment and the elements of these offenses.  The jury was explicitly told that they would receive additional and more detailed instructions at the conclusion of the case.  In fact, this admonition came in the opening paragraph of the preliminary instructions.

It is the obligation of the court to assist the jurors in their understanding of complex matters.  Given the number of charges here, three different criminal code sections alleged to be violated and three defendants charged in a different array of charges, there was a heightened need to place the charges in some sort of context that could be followed during the trial.

The preliminary instructions accomplished this.  The jurors were permitted to keep the preliminary instructions in the course of trial just as they are permitted to keep the final instructions during deliberations.[5]  Obviously, there is no way to determine the extent to which this procedure assisted the jurors.  The court notes that the jurors acquitted defendant Sotolongo and Musselwhite on the charges for which there was the least evidence and acquitted defendant Garrett against whom there was by far the least evidence.

The defendants refer to these preliminary instructions as a "highly irregular procedure".  They suggest that the court was under some obligation to inform the jurors that they could not use the preliminary instructions as a part of their deliberations.  They never requested such an instruction prior to deliberations.  The preliminary instructions remained valid throughout deliberations.  Nothing in the final instructions usurped the preliminary instructions about the burden of proof, the jurors' need to avoid extraneous influences, the need to give separate consideration to each defendant in each count or any of the other preliminary instructions.  The final instructions simply added more detailed information concerning definitions of terms and the defenses.

---

[5] This court left Orlando before the jury's deliberations completed.  In response to a question from jurors, the defendants moved that the court collect the copy of the preliminary instructions from the jurors.  The judge who received the verdict granted the request because it was unresisted.  There was nothing wrong with permitting the jurors to retain the preliminary jury instructions.

The court has the right to set reasonable deadlines. The deadline concerning preliminary instructions simply required the parties to make objections and suggestions to the preliminary instructions a few business days prior to trial. No defendant requested additional time and there was no justification for the last minute request for an additional instruction as the jury was being empaneled. Of course, the good faith defense instruction was in the final jury instructions in the form requested by the defendants.

The defendants simply failed to comply with the deadline with respect to their request for a good faith defense instruction. Given the lack of an excuse for this failure and given the fact that the instruction was ultimately presented to the jury and argued by all counsel, the failure to request a timely preliminary jury instruction does not give rise to the need for a new trial.

### D. Financial Institution "Records Custodians"

The defendants' fifth claim is that custodians of records without firsthand knowledge of the loans at issue in this case were permitted to give expert or lay opinions about the effect that false entries in loan applications had on the bank's decision to grant the loan.

The government was obligated to prove the element of materiality for Counts 2 through 12 of the indictment. Materiality, of course, is the natural tendency to influence, or the capability of influencing, the alleged victim's decision to make a loan. United States v. Neder, 197 F.3d 1122 (11th Cir. 1999) And so, Lanisa Jenkins testified on behalf of victim Bank of America. She is a vice president and a business support manager for Bank of America. She has served as an underwriter, loan processor and loan auditor at the bank. Dkt. No. 272, pp. 165-66. She has firsthand knowledge of Bank of America's lending practices and knows what is important to its lending decisions. Dkt. No, 272, pp. 170-73. As such, she was able to testify as to what the bank's practice would have been had a potential borrower's income not been fraudulently misstated. Dkt. No. 272, p. 173.

Debbie Kirk testified for victim Wells Fargo. She has twenty years experience in banking and evaluates Wells Fargo mortgage underwriters for skill in making proper credit decisions. Dkt. No. 275, p. 6. Tammy Ryan of JP Morgan has worked in banking for over twenty years. She works in underwriting management in the bank's mortgage division. She performs risk analysis on mortgage loan files for the bank. Dkt. 265, p. 118. Brett Elstrom was a senior mortgage underwriter for Washington Mutual Bank. He is a loan quality review analyst whose job it is to check for proper underwriting, consistent with proper bank practices. Dkt. No. 265, p. 198.

Each of the bank representatives in the case was exceedingly well qualified to testify about his or her bank's lending practices. But the evidence in the case did not present close or difficult issues of materiality as it related to the underwriting decisions. For example, witness George Goetz is a Pennsylvania resident who makes a living setting up amusement park rides for carnivals. He consistently earns approximately $60,000 a year. The defendants in this case structured and executed a transaction whereby Mr. Goetz was able to purchase a $1.4 million property at 120 Coral Way, Port Orange, Florida. In the application, it was represented to the bank that he had $35,000 per month income, at least $300,000 in cash and a $650,000 home. Goetz did not fill out the application. None of the foregoing financial information was even close to the truth. Naturally, even Mr. Goetz was surprised to qualify for a loan to purchase a $1.4 million piece of property. So when well-qualified bank representatives testified that they don't give loans to people who wildly and fraudulently overstate income and assets, it was hardly any sort of a surprise.

The government satisfied its burden of proving materiality with evidence that was competent and derived from firsthand knowledge of each of the victims' banking practices.

### E.  Defendant Musselwhite's Theory of Defense Instruction

The requested instruction was rejected by the court for the reasons set forth in <u>United States v. Barham</u>, 595 F.2d 231 (5th Cir. 1979).

## F. Defendant Sotolongo's Rejected Plea Agreement

Defendant Sotolongo contends that he was denied due process of law when his plea agreement was rejected by a district judge who later recused himself from the case upon learning that one of the victim banks presented a conflict of interest. This is not grounds for a new trial. Nothing about the rejection of Mr. Sotolongo's plea agreement would arguably give rise to the need for a new trial. This decision had no effect on the conduct of the trial. This court independently reviewed each motion that was ruled upon by Judge Dalton. The motions presenting the most significant decisions were those to reject the plea agreement and to deny the motion to suppress evidence. I would have denied the motion to suppress evidence without need for an evidentiary hearing and would have also rejected the plea agreement.[6]

## G. District Judge Case Assignment

Finally, the defendants contend that somehow they were denied due process of law when the government identified this case as related to another,[7] thereby causing the case to be reassigned. Dkt. No. 99. They contend that this was a violation of the local rules and therefore a violation of due process of law. The defendants cite no authority for the proposition that an alleged violation of a local rule relating to case assignment could somehow arise to a Constitutional deprivation. The defendants, of course, have no right to have their case heard by any particular Article III judge. In any event, the reassignment

---

[6] The decision to reject the plea agreement is obviously moot as the government withdrew the plea agreement after the court rejected it.

[7] See Dkt. No. 42 in this matter and Dkt. No. 28 in United States v. Coton, 6:13cr0261 (M.D. Fla).

9

was without legal significance as ultimately the undersigned was requested to handle this matter.[8]

### III. Conclusion

Upon the foregoing,

**IT IS ORDERED** that the defendants' motion for a new trial is denied.

**DATED** this 3rd day of December, 2014.

                                             JOHN A. JARVEY
                                             UNITED STATES DISTRICT JUDGE

---

[8] I volunteered to handle tobacco litigation in the Middle District of Florida. When the cases assigned to me settled, I informed the court that I was available to handle any other matter pending in April 2014.